FILED
2011 Aug-31  AM 09:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN  DIVISION

| | | |
|---|---|---|
| **SWAGG TRANSPORTATION, INC.,** | ] | |
| **d/b/a REDHOT RECYCLING,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-10-BE-2416-E** |
| | ] | |
| **SUPERVALU, INC.,** | ] | |
| | ] | |
| **Defendants.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This diversity matter, involving the alleged breach of contract to procure insurance and the enforceability of an indemnity clause, is before the court on "Defendant's Motion for Judgment on the Pleadings" (doc. 19); "Plaintiff's Motion for Summary Judgment" (doc. 20); and "Defendant's Motion for Summary Judgment" (doc. 26). For the reasons stated in this Memorandum Opinion, the court finds that Supervalu's motion for judgment on the pleadings is MOOT; that Red Hot's motion for summary judgment is due to be DENIED; and that Supervalu's motion for summary judgment is due to be GRANTED.

## PROCEDURAL HISTORY

On July 28, 2010, Plaintiff, Swagg Transportation, Inc., doing business as Red Hot Recycling, filed a Complaint for Declaratory Judgment in the Circuit Court for Calhoun County, Alabama.  (Docs. 1-1 & 6-1).  In that Complaint, Swagg stated that it had entered into a contract with Defendant, Supervalu Holdings, Inc. (misidentified as Supervalu, Inc.) to remove a water

1

tank from Supervalu's property, and that the contract contained a clause providing that Red Hot must hold Supervalu harmless for damages, liability, or claims resulting from the removal of the tank.  Because Supervalu was named as a defendant in a subsequent lawsuit in Alabama state court arising out of the removal of the water tower and had advised Swagg that it was invoking the hold harmless clause, Swagg requested that the court enter a declaratory judgment as to whether Swagg was liable to Supervalu under that clause.

On September 8, 2010, Defendant Supervalu removed the case to this federal court (doc. 1) based on diversity of citizenship, and filed an Answer and Counterclaim (doc. 3).   The counterclaim asserts two counts: Count I alleges that Red Hot breached its contract by failing to obtain and maintain a policy of commercial general liability insurance naming Supervalu as an additional insured; and Count II alleges that Red Hot has breached the defense and indemnification provisions of the contract between the parties as to the state court litigation. On October 8, 2010, Red Hot filed a motion to remand the case to state court (doc. 8), and the court subsequently denied the motion, satisfied that it has jurisdiction (doc. 12).

On January 14, 20100, Red Hot filed a motion for summary judgment (doc. 20).  That same day, Supervalu filed a motion for judgment on the pleadings (doc. 19).  Subsequently, Supervalu filed a separate motion for summary judgment (doc. 26).   The parties have fully briefed these dispositive motions.

## FACTS

The material facts are not in dispute.

Supervalu is in the grocery retail industry and owns a wholesale grocery business in Calhoun County, Alabama.  Red Hot is a metal recycling business also located  in Calhoun

County.  In 2008, Red Hot agreed with Supervalu that Red Hot would provide Supervalu with bins for deposits of scrap metal on Supervalu property, and that Red Hot would pick up the bins and pay Supervalu per pound for the metal.  At the time of this agreement, Supervalu required Red Hot to have in effect a general liability insurance policy of not less than one million dollars in coverage.  Based on the policy provided to the court, Red Hot obtained a policy of insurance issued by Catlin Specialty Insurance Company that included coverage for commercial general liability coverage in the amount of $1,000,000 with the effective dates of December 3, 2008 to December 3, 2009 and listing  "Swagg, Inc. dba Red Hot" as the only named insured.  (Doc. 27-1, at 66).

On August 19, 2009, Red Hot and Supervalu entered into a contract for the dismantling and removal of a steel water tank that existed on Supervalu's property and that Supervalu desired to sell for scrap.  Under the terms of the contract, Red Hot undertook the following obligations: 1) to purchase the water tank and tower structure; 2) to remove the water tank from the property; 3) to terminate and cap off all electrical and plumbing connections to the tower; 4) to restore the premises to a clean condition; and 5) to procure insurance naming Supervalu as an additional insured.  The contractual provision regarding the procurement of insurance provides as follows:

> 6.  Buyer [Red Hot] shall obtain and maintain at all times during the term of this Agreement a policy of commercial general liability insurance with a combined single limit of at least Three Million Dollars ($1,000,000[1]) and a deductible amount not to exceed Five Thousand Dollars ($5,000.00), written on an occurrence basis, issued by an insurance company

---

[1] The text of the contract refers to an insurance policy of "at least Three Million Dollars." However, in the numerical parenthetical following the spelling of that number, the number "1" was written on top of  the number "3" in "($3,000,000)."  Red Hot asserts that the parties intended the contract to require a policy of at least *one* million dollars, and Supervalu does not dispute that assertion.

3

reasonably acceptable to Seller [Supervalu] and otherwise in form and substance reasonably satisfactory to Seller, which policy shall name Seller as an additional insured, and shall not be subject to cancellation or material amendment without 30 days' prior written notice to Seller.  Buyer shall provide a certificate of such insurance to Seller prior to commencing the work described . . . .

(Doc. 6-2, ¶ 6).

The contract also included the following indemnity agreement:

9.   Buyer [Red Hot] shall indemnify and defend Seller [Supervalu] against any and all loss, cost, damage, claim, liability and expense of any kind whatsoever (including without limitation attorneys' fees, court costs and settlement costs), in connection with any personal injury, death or property damage, mechanics lien claims, or actual or alleged violation of Environmental Laws arising out of, caused by, or resulting from the activities of Buyer or its agents, employees or contractors in, on or about the Property, or in connection with Buyer's removal, transportation, use or disposition of the Water Tank.  Buyer waives and releases any claim against Seller, its agents, employees or affiliates, for damage or injury occuring (sic) in connection with the Property, the Water Tank or this Agreement, regardless of cause.

(Doc. 6-2,¶ 9 ). Supervalu drafted the contract in question, and  William Wegrzyn, the President of Red Hot, signed it on behalf of Red Hot.

Because, as noted previously, Red Hot had already obtained a policy of general liability insurance coverage issued by Catlin Specialty Insurance Company in the amount of $1,000,000 that was in effect in 2009, it did not purchase any additional insurance after executing the contract regarding the water tower on August 19, 2009.  However, Red Hot did not add Supervalu, or attempt to add Supervalu, as an additional insured under that insurance policy or any other insurance policy.

Red Hot hired subcontractor Treetop Tree Service to dismantle and remove the water tower.  Supervalu then gave Treetop access to the tank and its property.  According to the

4

deposition testimony of William Wegrzyn, President of Red Hot, before work on the water tower

commenced, Paul Smith, a representative of Supervalu, met with Wegrzyn and Dan Hopkins, a

representative of Treetop, and asked if Red Hot still had in effect a policy with a million dollars

of general liability insurance coverage.   Wegrzyn further testified that he assured Smith the

general liability insurance policy was still in effect, but that before work on the tower began,

neither Smith nor anyone from Supervalu requested to see documentation showing whom and

what the policy covered, and Red Hot did not volunteer such documentation.

> Q.  Did you provide a certificate of insurance to SUPERVALU prior to any
> work commencing on the disassembly of the water tank?
> A.  For the disassembly only or – during the time at the time I signed the
> contract, Paul Smith asked if our insurance policy was still in effect.  He did not ask
> for any declarations.  Did not ask for a copy.  At the same time, he also asked Dan
> Hopkins of Treetop as well regarding their insurance requirements.
> Q.  All right.  I understand what you're saying.  What I'm trying to figure out
> is pursuant to the terms and conditions of this agreement, Defendant's Exhibit 3, if
> you provided a certificate of insurance to SUPERVALU prior to commencing work
> on the water tank disassembly project?
> A.  No.

(Doc. 27-1, at 25-26).  As noted, Red Hot had provided metal bins on Supervalu's property to

hold cut up metal, but Wegrzyn acknowledged in his affidavit that neither Red Hot nor Supervalu

otherwise retained any supervision or control over the project, and neither provided any tools or

other equipment that Treetop used in the removal of the tank.  (Doc. 35-1, at 44.).

One of Treetop's employees, Chris West, subsequently filed a lawsuit in the Circuit Court

of Calhoun County, Alabama, asserting claims against various defendants, including Supervalu,

based on injuries he allegedly received while working for Treetop to fulfill Red Hot's contract to

remove the water tank on Supervalu's property.  Red Hot's Complaint for Declaratory Judgment

describes the activities that occurred at the time of West's injuries:

> On or about August 27, 2009, Chris West, an employee of Treetop Tree
> Service was cutting the steel tank with a torch, and the hot metal ignited a
> hydraulic line on the lift where the employee was standing which caused
> burns over the employee's body and further caused the employee to fall from
> the lift.

(Doc. 6-1, ¶ 5).

West's underlying complaint does indeed focus on the events of August 27, 2009,

stating that "at all times relevant to this incident, Tree Top was in the process of

dismantling a water tank. . . .Defendants Tree Top and Super Valu (sic) joined together in a

joint venture to dismantle a water tank in order to sell the metal for scrap." (Doc. 6-13, ¶¶

9-10). However, West's complaint describes the accident somewhat differently from the

declaratory judgment complaint. According to the scenario set out in West's complaint,

West was working with Dan Hopkins out of a bucket truck equipped with two buckets.

Hopkins worked out of one bucket on the passenger side of the truck and West worked out

of the bucket on the driver's side, but Hopkins had access to control of both buckets and

West did not have access to the controls. A third person, Charles Hollis, was working on

the ground, noticed a fire underneath Hopkins's bucket, and yelled up to the men in the

buckets. As Hopkins began lowering his bucket, the hydraulic line under that bucket

"began shooting flames of fire toward the Plaintiff and his bucket," eventually engulfing

West in flames and causing him "to jump approximately 25 feet to the ground." (Doc. 6-3,

¶¶ 11-12).

West's complaint asserts in Count I claims of negligence/wantonness against

various defendants, including Supervalu, Treetop, Hollis, and Hopkins, in failing to provide

West with a safe place to work, specifically in failing "to furnish and/or use reasonable

6

safety devices, safeguards, safe equipment, methods, and processes reasonably adequate to render Plaintiff's work environment safe.  Defendants Hopkins and Hollis had authority from Defendants Treetop Tree Service, Super Value (sic), Hopkins & Associates [] to instruct the Plaintiff and direct the work to be performed on the day Plaintiff sustained the relevant injuries."  (Doc. 6-3,  ¶¶ 17-18).  Count I states that Hopkins and Hollis were supervising Plaintiff at the time of the accident and that they were the Defendants who "failed to provide the Plaintiff with safety devices, safe equipment, and a safe work environment."  Doc. 6-3, ¶¶ 19-20).  In Count II, West's complaint asserts claims against various defendants, including Supervalu and Treetop, alleging that they negligently/wantonly hired, supervised, trained and/or retained Treetop's employees/agents Hopkins and Hollis. (Doc. 6-3, ¶ ¶ 29-32).

Wegrzyn testified that Hopkins and Charles Hollis were partners of its contractor, Treetop, but neither they nor West were employees of Red Hot.

> Q.  Okay.  Do you know Charles Hollis?
> A.  Yes.
> Q.  How do you know Mr. Hollis?
> A.  He is a partner with Dan Hopkins in the tree service.  I bought scrap off of Mr. Hollis in the past as well.
> . . .
> Q.  Has Chris West ever been an employee of Swagg Transportation, Inc.?
> A.  No.
> Q.  What about Mr. Hopkins?
> A.  No.
> Q.  What about Mr. Hollis?
> A.  No.

(Doc. 27-1, at 18  & 38).

In June 2010, Supervalu notified Red Hot that Supervalu was invoking paragraph

nine of the contract between the parties, demanding that Red Hot defend and indemnify it as to the lawsuit by West.  Also during that month, Supervalu requested a copy of the declarations page of the general liability insurance policy in effect at the time of the accident in question, and Red Hot provided it.   On July 1, 2010, Red Hot sent Supervalu a letter informing it that Red Hot planned to seek a declaratory judgment on the indemnity issue.

On July 23, 2010, Red Hot filed a Complaint for Declaratory Judgment action in the Circuit Court of Calhoun County, stating that Supervalu had notified Red Hot of its claims under the hold harmless clause and that Red Hot was petitioning the court "to enter a Declaratory Judgment as to whether or not the Plaintiff is liable to the Defendant under the hold harmless clause of the [] contract."  (Doc. 6-1, ¶ 8).

Supervalu's counterclaim requested that the court not only declare that Red Hot was required to defend and indemnify it in the *West* litigation but also that Red Hot breached its contract to procure insurance covering the work removing the water tank and to add Supervalu as an additional insured.

## MOTION FOR JUDGMENT ON THE PLEADINGS

In its brief addressing the summary judgment motions, Supervalu explained that it had filed the motion for judgment on the pleadings based on the understanding that the court would first address the issue of whether Red Hot must defend and indemnify Supervalu under the terms of the contract between the parties, and would address at a later date Supervalu's claim for failure to procure insurance.  However, after Red Hot filed its motion for summary judgment, Supervalu then filed its own motion for summary judgment

addressing the failure to procure insurance claim.  As an explanation for this second

motion, Supervalu stated "since the material facts surrounding th[e] claim [for failure to

procure insurance] have essentially been determined and are undisputed, Supervalu does

not object to moving forward with the resolution of that claim as a matter of law."  (Doc.

25, at 2 n.1.).

 In light of the filing of the cross-motions for summary judgment, the court finds the

motion for judgment as a matter of law to be MOOT.  The court will proceed to address all

issues in the cross-motions for summary judgment.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

 In their cross motions for summary judgment, the parties raise the following issues:

(1) whether the indemnity agreement between the parties is enforceable under Alabama

law, and if so, whether Red Hot is obligated pursuant to the contract to defend and

indemnify Supervalu in the *West* litigation; and (2) whether Red Hot breached the provision

of the contract between the parties regarding the procurement of insurance.

### Standard of Review

 Summary judgment is an integral part of the Federal Rules of Civil Procedure.

Summary judgment allows a trial court to decide cases when no genuine issues of material

fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R.

Civ. P. 56.  When a district court reviews a motion for summary judgment it must

determine two things: (1) whether any genuine issues of material fact exist; and if not, (2)

whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

 The moving party "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The

moving party can meet this burden by offering evidence showing no dispute of material fact

or by showing that the non-moving party's evidence fails to prove an essential element of

its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule

56, however, does not require "that the moving party support its motion with affidavits or

other similar materials *negating* the opponent's claim."  *Id.*

    In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the

nonmoving party presented sufficient evidence on which a jury could reasonably find for

the nonmoving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986); *Cottle v.

Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from

weighing the evidence and making credibility determinations, because these decisions fall

to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T.

Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins.

Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn

from the underlying facts must be viewed in the light most favorable to the non-moving

party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of

every inference but only of every reasonable inference."  *Id.*  The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary

judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if*

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

The applicable Rule 56 standard is not affected by the filing of cross motions for

summary judgment. *See, e.g., United States v. Oakley*, 744 F.2d 1553, at 1555-56 (11th Cir.

1984). When parties file cross motions for summary judgment, "each side must still

establish the lack of genuine issues of material fact and that it is entitled to judgment as a

matter of law." *Busby v. JRHBW Realty, Inc.*, 642 F. Supp. 2d 1283, 1288 (N.D. Ala.

2009). "The fact that both parties simultaneously are arguing that there is no genuine issue

of fact . . . does not establish that a trial is unnecessary thereby empowering the court to

enter judgment as it sees fit." *Id.* at 1289 (internal quotation marks omitted). The Eleventh

Circuit has noted that "[c]ross motions for summary judgment will not, in themselves,

warrant the court in granting summary judgment unless one of the parties is entitled to

judgment as a matter of law on facts that are not genuinely disputed." *Oakley*, 744 F.2d at

1555. Nevertheless, "cross-motions may be probative of the non-existence of a factual

dispute when . . . they demonstrate a basic agreement concerning what legal theories and

material facts are dispositive." *Id.* at 1555-56.

## Discussion

### 1.  Indemnity Agreement

Both Red Hot and Supervalu bring claims based on an indemnity agreement

providing that Red Hot will defend and indemnify Supervalu for "any and all loss, cost,

damage, claim, liability and expense of any kind whatsoever ... arising out of, caused by, or

resulting from the activities of [Red Hot] or its agents, employees or contractors ... in connection with [Red Hot's] removal ... of the Water Tank." (Doc. 6-2, ¶ 9). In its Complaint for Declaratory Judgment, Red Hot requests that the indemnity agreement be declared unenforceable, and, in its counterclaim, Supervalu requests that the court enforce this agreement.

In claims based on breach of an unambiguous contract, the court must determine the intent of the parties based on the language of the contract itself. *See McLemore v. Hyndai Motor Mfg. Ala. LLC,* 7 So. 3d 318, 333 (Ala. 2008). The intent, as expressed in the clear and unambiguous terms of the indemnity contract, was to hold Supervalu harmless from liability arising from the actions of Red Hot – not the actions of Supervalu – and Red Hot's contractors in disassembling and removing the water tower from Supervalu's property. The parties before this court do not dispute that intent.

Neither do they dispute that Supervalu had no involvement in the alleged negligent/wanton actions that were the focus of the underlying lawsuit by West: the disassembly and water tower removal and the training and supervision of those performing the disassembly and removal tasks. The parties even agree that Supervalu is not negligent or wanton as a matter of fact and law. However, given the fact that West *claims* Supervalu is guilty of wrongful conduct, albeit that the claims are erroneous, the parties disagree about whether the indemnity contract is enforceable as a matter of law as to the lawsuit by West. If it is enforceable, they further disagree about whether the obligation to indemnify is yet ripe for determination.

12

a.  Enforceability

Red Hot's first argument on the indemnity issue is that the indemnity agreement is unenforceable under Alabama law to the extent that it covers Supervalu's own negligence/wantonness.

"[T]he general rule in Alabama is that joint tort-feasors are not entitled to indemnity[; however], when one joint tort-feasor agrees in writing to indemnify the other, even for claims based on the other's own negligence, the agreement, if it is a valid indemnity agreement, can be upheld, and the joint tort-feasor can receive indemnification." *Apel Mach. & Supply Co., Inc. v. J.E. O'Toole,* 548 So. 2d 445, 448 (Ala. 1989) (citing *Crigler v. Salac*, 438 So. 2d 1375, 1386 (Ala. 1983) and *Indus. Tile, Inc. v. Stewart*, 388 So. 2d 171, 176 (Ala. 1980)).  The line of cases upholding agreements to "indemnify the other for the other's *own negligent conduct"* enforces those agreements only when the "intent to indemnify [is] expressed in 'clear and unequivocal language' and the parties [] have 'knowingly, evenhandedly, and for valid consideration' entered into it.  While 'talismanic language' is not a necessity, the intention to indemnify for the indemnitee's own negligence must be clear from the instrument."  *Humana Medic. Corp. v. Bagby Elevator Co.*, 653 So. 2d 972, 974-5 (Ala. 1995)(citations omitted)(emphasis in original).

Other exceptions to the general rule exist when the joint tortfeasor claiming indemnity "'has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed' was the proximate or primary cause of the injury."  *Crigler*, 438 So. 2d at 1385 (quoting *Mallory S.S. Co. v. Druhan*, 84 So. 874, 877 (Ala. App. 1920)).

13

This court must determine whether any of the exceptions to the general rule against joint tortfeasor indemnity apply to the instant case, and allow Supervalu to enforce the indemnity agreement between the parties.  Red Hot argues that Supervalu cannot fit under the exception that arises when an indemnity agreement expressly covers the indemnitee's own negligence, because the agreement in question does not purport to cover Supervalu's own negligence.  The court agrees that the agreement does not clearly express an intent to cover Supervalu's own negligence, as required by the *Industrial Tile* and *Bagby* cases.  Rather, it provides that Red Hot has an obligation to indemnify and defend Supervalu from claims "arising out of, caused by, or resulting from the activities of *Buyer or its agents, employees or contractors* in disposition of the Water Tank."  (Doc. 6-2, ¶ 9) (emphasis added).  *If* Supervalu were arguing that the only basis of enforcement is that the agreement expressly covered its own negligence, it would lose.  However, its argument is different.

Instead, Supervalu argues that the facts are undisputed that *Supervalu* did not commit the wrongful acts at issue in the *West* suit.  Because Supervalu can enforce the indemnity clause for claims as long as they are not based on Supervalu's *own* negligence/wantonness, and because Supervalu did not in fact commit the wrongful acts in question, Supervalu reasons that the clause is necessarily enforceable.  The court will examine the claims asserted in the *West* complaint to determine whether this argument succeeds.

Count I alleges that the defendants, including Supervalu, were negligent or wanton in that they failed to provide West with a reasonably safe place to work, specifically by "fail[ing] to furnish and/or use reasonable safety devices, safeguards, safe equipment,

14

methods, and processes reasonably adequate to render Plaintiff's work environment safe."
( Doc. 21, Ex. 3, ¶ 17 ).  Despite these assertions against all defendants, including
Supervalu, both parties in the instant case agree that Supervalu did not reserve or have any
right of control or supervision over Treetop's dismantling and removal of the tank, and did
not provide or agree to provide any equipment or tools for the project.  Supervalu is a
grocery retailer and did not attempt to use its own employees to dismantle the water tower.
Rather, it hired Red Hot to do that job, which in turn hired Treetop.  Supervalu owned the
land where the accident occurred, but *West's* complaint does not claim that some hidden
defect in the land caused the accident.  If anyone's negligent or wanton actions at the scene
of the accident directly caused the accident, the Treetop employees, West, Hollins and
Hopkins, were the ones at the scene, not Supervalu employees.  If any equipment was
faulty, such as the bucket truck, controls, hydraulic line, or torches, the equipment at the
scene of the accident was owned or supplied by Treetop, not Supervalu.  Therefore, despite
the allegations against Supervalu in the underlying complaint, *both* parties to the instant
suit acknowledge that Supervalu was not the party who failed to furnish safety devices or
safe equipment or safe work processes.  In other words, even Red Hot acknowledges that
Supervalu was not negligent or wanton *in fact*.  But, Red Hot insists that West's allegations
about Supervalu's own negligence or wantonness – even though those allegations are in
fact clearly wrong – absolve Red Hot from any obligation to defend and indemnify
Supervalu.

        The court finds that, even when viewed in the light most favorable to Red Hot, the
indemnity agreement is enforceable as to Count I in the *West* litigation.  It is enforceable

15

because the facts as presented in the instant case fall within the exception upholding indemnity agreements when the indemnitees are "not [] guilty of any fault, except technically or constructively."  *Mallory S.S. Co. v. Druhan*, 84 So. at 877; *see also J.C. Bradford & Co. v. Calhoun,* 612 So. 2d 896, 398 (Ala. 1992) and *Crigler v. Salac,* 438 So. 2d at 1385 (both acknowledging and discussing the exception and quoting *Mallory).*

The case of *Mallory S.S. Co. v. Druhan* provides an example of a case upholding an indemnity agreement based on this exception. In that case, the steamship company furnished a defective loading apparatus to a stevedore company, and the apparatus injured a stevedore employee using the apparatus to perform his loading job.  The Court of Civil Appeals held that the stevedore employer could bring suit to enforce an indemnity agreement against the steamship company  notwithstanding the employer's own negligence in failing to inspect the appliance.  In determining that an exception was appropriate to the general rule of no indemnity, the court of appeals reasoned that the stevedore employer was guilty of only *"passive"* negligence in failing to inspect the faulty defective equipment whereas the steamship company was guilty of *active* negligence in supplying a defective product and breaching warranties of merchantability and fitness for a particular purpose. Because the "primary duty of furnishing safe appliances rests" upon the steamship company, the court required that company to indemnify the employer.  84 So. at 877-78 (emphasis supplied).

Although *Mallory* is an old case, the Supreme Court of Alabama has acknowledged the viability of the exception recognized in *Mallory.*  In more recent cases, the Supreme Court has affirmed the existence of the exception, quoting *Mallory's* language that the

general rule of no indemnity among joint tortfeasors does not apply where the indemnitee

has "not been guilty of any fault, except technically or constructively." *See, e.g., J.C.*

*Bradford*, 612 So. 2d at 398; *Crigler*, 438 So. 2d at 1385; *see also Coates v. CTB, Inc.*, 173

F. Supp. 2d 1200, 1203 (M.D. Ala. 2001) (applying the *Mallory* exception to allow a

builder to bring suit for indemnity against a manufacturer of defective equipment used in

building construction).

      In the instant case, both parties before this court agree that Supervalu is not even

passively or constructively guilty of the allegations in Count I of the *West* litigation.  The

undisputed evidence reflects that Supervalu was not the party who failed to furnish safety

devices or safe equipment or safe work processes.  Supervalu was simply the grocery

retailer who owned the property where the accident occurred.  The evidence further reflects

that the active fault rests upon Red Hot's contractor, Treetop and Treetop's agents and

employees, who were the active participants in dismantling and removing the water tower.

In Red Hot's brief in support of its motion for summary judgment, Red Hot's counsel states

that "a summary judgment is due for both Supervalu and Red Hot in the state court case by

West." (Doc. 21, at 12).  Such an acknowledgment is rare indeed.  In any event, given that

an exception exists when the indemnitee is passively negligent or only technically or

constructively negligent, logic suggests that an indemnitee who is not guilty at all has the

same – or an even greater –  entitlement to application of the exception.

      Based on the undisputed evidence presented to this court, the court finds that the

*Mallory* exception applies. Indeed, the *Mallory* exception would also apply even if

Supervalu were passively or constructively guilty.  Therefore,  the indemnity agreement is

enforceable as to the claims asserted in Count I of the underlying complaint in the *West* litigation.

Count II of *West's* complaint alleges that defendants, including Supervalu, were negligent and/or wanton because they breached their duty "to hire staff qualified and/or competent to carry out and manage their business, to supervise their employees, and to provide staff trained in providing a fit, safe and habitable work environment for their employees." (Doc. 6-, at ¶ 29). Other paragraphs in that count focus on the alleged wrongful conduct of defendants Hollis and Hopkins, and state that the failure to train and supervise allegations are confined to the training and supervising of Hollis and Hopkins.

In the instant case, as noted previously, Red Hot acknowledged that it entered into a contract with Supervalu providing that Red Hot would dismantle and remove the water tank, and Red Hot – not Supervalu – in turn contracted with Treetop to do the dismantling and removal. Although West alleges that the tank removal project was a "joint venture" between Supervalu and Treetop, the undisputed evidence presented to this court does not support that allegation. Red Hot further acknowledged through President Wegrzyn's affidavit that Supervalu retained no supervision or control over the tank removal project, and did not provide any tools or other equipment that Treetop used in the removal of the tank. In his deposition, Wegrzyn testified that West was an employee of *Treetop* and that Hollis and Hopkins, the defendants in the underlying case who were allegedly negligently/wantonly trained and supervised, are partners in *Treetop.*

These undisputed facts, presented in the instant case, also support the enforceability of the indemnity agreement as to Count II, because, once again, Supervalu falls within the

18

exception to the general rule of no indemnity that it was not guilty at all or "not [] guilty of any fault, except technically or constructively." *See Crigler*, 438 So. 2d at 1385. Therefore, the court finds that the indemnity agreement is enforceable as to both counts asserted against Supervalu in the *West* complaint.

2.   Application

Having determined that the indemnity agreement is enforceable as to allegations against Supervalu in both counts of the underlying complaint, the court next turns to the related issue of whether its enforceability renders Red Hot liable to defend and indemnify Supevalu. Because Red Hot only challenges the enforceability and ripeness of the indemnity provision, the court will not spill unnecessary ink as to its general application. The agreement provides that Red Hot will defend and indemnify Supervalu for loss or liability "resulting from the activities of [Red Hot] or its agents, employees or contractors ... in connection with [Red Hot's] removal ... of the Water Tank." (Doc. 6-2, ¶ 9).  The court finds that West's complaint falls within that language; such litigation is exactly what the hold harmless clause was intended to cover. Indeed, the very nature of such an agreement is a bargained-for "assumption of the risk" of any future litigation in exchange for the opportunity to do the work.  Unfortunately for Red Hot, the risk of future litigation that it assumed has become a reality in the *West* litigation.

Red Hot objects to Supervalu's request for damages under this agreement as premature under a ripeness/prematurity theory, as no judgment of a sum certain has occurred in the *West* litigation.   The court acknowledges that case law supports the proposition that the determination whether an indemnitee, such as an insurer, has a duty to

indemnify is premature or is not ripe[2] for adjudication in a declaratory judgment action
"until the insured is in fact held liable in the underlying suit."  *Assurance Co. of Am. v.
Legendary Home Builders*, 305 F. Supp. 2d 1266, 1270 (S.D. Ala. 2003) (citations
omitted).  However, the duty to defend and to pay costs and fees *that have already accrued*
is quite different.  The indemnity agreement requires Red Hot to provide Supervalu a
defense and to provide it now, not in the future, and also to pay for attorneys' fees and court
costs and other resulting expenses that Supervalu has already incurred.  That obligation and
those expenses are not speculative but are concrete and "ripe."  *See Am. Fid. & Cas. Co. v.
Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.,* 280 F.2d 453, 458 (5th Cir.
1960) (opining that the duty to indemnify a judgment and the duty to defend "are separate
and distinct in the sense that the duty to defend does not depend upon the payment to
damage claimant or the rendition of a judgment declaring the assured's legal obligation to
pay")[3].  Further, the duty to defend is generally broader than the duty to indemnify.  *See id.*
at 458-61; *Employers Mut. Cas. Co. v. Evans*, 76 F. Supp. 2d1257, 1262 (N.D. Ala. 1999)
("The duty to defend is more extensive than the duty to indemnify.").

     Thus, the court finds that a declaration as to Red Hot's duty to defend is clearly

---

[2]Some authorities use the term "ripe," which has jurisdictional connotations, to address
this issue while other authorities couch the issue in terms of the court's discretion and efficiency
rather than its jurisdiction.  *See, e.g, Nationwide Ins. v. Zavalis,* 52 F.3d 689, 693 (7th Cir. 1995)
(stating that "the duty to indemnify is not ripe for adjudication); *American Fid. & Cas. Co. v.
Pennsylvania Threshermen & Famers' Mut. Cas. Ins. Co.,* 280 F.2d 453, 461 (5th Cir. 1960)
(addressing this issue as one of discretion).

[3] *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc)
(adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior
to the close of business on September 30, 1981).

appropriate and should proceed at this time.  It finds that Red Hot must provide a defense

for Supervalu in the *West* lawsuit under the hold harmless clause of the relevant contract.

Further, the court finds that Red Hot must also indemnify Supervalu "against any and all

loss, cost, damage, claim, liability and expense of any kind whatsoever (including without

limitation attorneys' fees, court costs, and settlement costs)," that it has already incurred

from the *West* lawsuit as a result of the accident in question,  as the agreement clearly and

unambiguously requires.

 To the extent that Red Hot argues that it is not yet liable to indemnify Supervalu for

any judgment rendered against Supervalu in the *West* lawsuit, it is correct; as the court

noted earlier, *that particular liability* is speculative at this point and will continue to be

until a judgment of a sum certain, if any, is entered against Supervalu in the underlying suit.

However, the court notes that, unlike many declaratory judgment actions, Red Hot has

raised no true dispute as to its obligation to pay should a judgment ultimately be awarded

against Supervalu in that litigation.

 Consistent with these rulings, the court will enter judgment against Red Hot and in

favor of Supervalu as to the claim in the Complaint for Declaratory Judgment, denying Red

Hot's motion for summary judgment.  Similarly, Count II of Supervalu's counterclaim

requests a judgment in its favor on its claim that Red Hot breached the hold harmless clause

requiring Red Hot to defend Supervalu in the *West* lawsuit and to indemnify Supervalu for

all expenses arising from that lawsuit. In accordance with its rulings, the court finds that

Supervalu's motion for summary judgment is due to be GRANTED, and will enter

judgment in favor of Supervalu and against Red Hot on the counterclaim's Count II.

Because Supervalu has not yet submitted proof of any damages resulting from the breach of the hold harmless clause, the court will GRANT Supervalu leave to prove such damages.

2.  Breach of Agreement to Provide Insurance

In Count I of Supervalu's counterclaim against Red Hot, Supervalu claims that Red Hot breached its agreement to obtain and maintain at all times during the term of the Water Tank Purchase Agreement a policy of commercial general liability insurance naming Supervalu as an additional insured.  The parties acknowledge that their agreement required Red Hot to procure such a policy naming Supervalu as an additional insured, and indeed, the agreement clearly states that obligation:  "Buyer shall obtain and maintain at all times during the term of this Agreement a policy of commercial general liability insurance . . . which policy shall name Seller as an additional insured. . . ." (Doc. 6-2, ¶ 6).  Further, the parties agree that although Red Hot did maintain at all times during the term of the relevant agreement a commercial general liability insurance policy, that policy did *not* name Supervalu as an additional insured.

Despite those undisputed facts, Red Hot claims that Supervalu waived its right to complain about this "breach," because Supervalu had an opportunity before the water tower project commenced to demand an inspection of the policy for compliance and it failed to make the demand or inspect the policy.  Supervalu denies that it was required to demand proof of compliance and denies that its failure to do so constitutes a waiver.  This court agrees with Supervalu.

In support of its waiver argument, Red Hot cites a rather elderly case:  *Murphy v. Shuster Springs Lumber Co.*, 111 So. 427 (Ala. 1927), which involved an option on a

timber contract.  The Supreme Court of Alabama in *Murphy* held that when the vendors refused on one ground a tender of performance outside the five-year period specified in the contract, they waived other grounds of refusal, such as the ground that the tender was not timely made within the five-year period. 111 So. at 430.  This court disagrees that *Murphy* requires or even arguably supports a finding in the instant case that Supervalu's failure to verify Red Hot's compliance constitutes waiver.  Although Red Hot asserts that Supervalu had an obligation to verify compliance before the accident and that *Murphy* supports that assertion, it does not do so.  The facts and issues are dissimilar, and *Murphy* is simply inapposite to the instant case.

Both parties cite *Stone Bldg. Co. v. Star Elec. Contractors, Inc.*, 796 So. 2d 1076 (Ala. 2000) as supportive of their positions.  However, this case does not support Red Hot's argument that that Supervalu must verify compliance or waive the ability to assert a breach of contract claim.  In *Stone*, the contract between the parties required that Star procure insurance that named Stone as an insured.  Although Star did procure insurance that named itself as an insured, the insurance did not name Stone as an insured.  Prior to the accident made the basis of the lawsuit, Star provided to Stone a copy of the certificate of insurance, which revealed that Stone was not an insured, but Stone made no objection.  Following the accident, Stone was sued and asserted a cross-claim against Star, including a claim for breach of the contract to procure insurance naming Stone as insured.  In affirming summary judgment in favor of Star on that claim, the Supreme Court of Alabama focused on the undisputed facts that, prior to the accident, Stone had received the certificate not naming Stone but yet, Stone accepted the certificate "as satisfaction of all requirements relating to

23

insurance under the executed subcontract." *Id.* at 1088, 1099.  Noting that Stone had received and explicitly accepted the certificate "without reservation," the Court held that Stone had waived the requirement to procure insurance naming it as insured.  *Id.* at 1099.

In the instant case, the undisputed facts are markedly different; after Red Hot and Supervalu signed the August 2009 contract and before West's accident, Supervalu did *not* receive a copy of the policy in question and was *not* otherwise put on notice that Red Hot had failed to comply with the contract.  The evidence certainly does *not* reflect that Supervalu received and accepted the policy or certificate without reservation as satisfaction of the contract to procure insurance. Therefore, the facts of the instant case clearly distinguish it from those of *Stone.*  Contrary to Red Hot's argument, *Stone* does not stand for the proposition that a party who contracts with another to procure insurance naming it as insured has an affirmative obligation to obtain a copy of the certificate of insurance to verify that the other contracting party has complied with the contract.  Further, it does not stand for the proposition that if the party does not so verify, it has waived it right to sue for breach of contract. Indeed, the court cannot find any controlling case law that stands for those propositions, and Red Hot has provided none.

The court finds that Red Hot is guilty of breach of contract; Supervalu and Red Hot entered into a contract whereby Red Hot agreed to obtain insurance in which Supervalu was to be listed as an additional insured, but Red Hot did not do so.  The court finds that the agreement to do so was clear and unambiguous.  Under Alabama law, an agreement to procure insurance is enforceable.  *McInnis Corp v. Nichols Concrete Constr., Inc.,* 733 So. 2d 418, 421 (Ala. Civ. App. 1998).  Therefore, the court finds in favor of Supervalu and

24

against Red Hot on the breach of contract claim asserted in Count I of Supervalu's counterclaim, finding that Supervalu's motion for summary judgment is due to be GRANTED as to that claim.

The court notes that its decision is based upon Red Hot's failure to obtain insurance *in which Supervalu was listed as an additional insured*, because Supervalu was not listed as an additional insured on the Catlin policy or any other policy.  The court does not make a finding as to whether the Catlin insurance policy in effect covering Red Hot would otherwise comply with the contract between the Red Hot and Supervalu.

The court further notes that Supervalu has not provided proof of specific damages resulting from the breach of contract to procure insurance.  If Supervalu desires any benefit other than the court's declaration that Red Hot has breached its contract, such as a judgment of monetary damages resulting from that breach, the court will grant Supervalu leave to prove such damages.

## **CONCLUSION**

For the reasons stated above, the court finds that Supervalu's motion for judgment on the pleadings is MOOT; that Red Hot's motion for summary judgment is due to be DENIED; and that Supervalu's motion for summary judgment is due to be GRANTED in its entirety.  The court will grant Supervalu leave to prove damages as a result of the breaches of its contract to hold harmless and contract to procure insurance listing Supervalu

as an insured.

Dated this 31st day of August, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE